East Baton Rouge Parish Clerk of Court

628653

| | |
|---|---|
| FIREFIGHTERS' RETIREMENT SYSTEM, MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM, AND NEW ORLEANS FIREFIGHTERS' PENSION & RELIEF FUND | * * * * * * |

DOCKET NO. _____ SEC. _____

**SEC. 23**

19TH JUDICIAL DISTRICT COURT

FEB 28 2014

BY_____
DY CLERK OF COURT

**VERSUS**

EISNERAMPER, LLP, AND EISNERAMPER (CAYMAN ISLANDS) LTD.

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel come Plaintiffs, **FIREFIGHTERS'**

**RETIREMENT SYSTEM** ("FRS"); **MUNICIPAL EMPLOYEES' RETIREMENT**

**SYSTEM OF LOUISIANA** ("MERS"); AND **NEW ORLEANS FIREFIGHTERS'**

**PENSION & RELIEF FUND** ("NOFF") (collectively referred to herein as "Plaintiffs" or

"Plaintiffs"), who file their Petition for Damages Petition for Damages. FRS and MERS are

constitutionally mandated, and statutorily regulated, arms of the State of Louisiana such that they

have no citizenship. FRS and MERS are arms of the state. The Louisiana Attorney General, in

Opinion Number 93-676, determined that "the statewide systems can be considered to be state

agencies, or at a minimum, entities or instrumentalities of the state."

    1.   Made Defendant herein are:

    A.    **EISNERAMPER LLP** ("Eisner (US)"), a "full service advisory and accounting

firm" that is "among the largest in the United States," is a limited liability partnership who may

be served at 750 Third Avenue, ATTN: Charles Weinstein, New York, New York 10017.

    B.    **EISNERAMPER (CAYMAN) LTD.** ("Eisner (CI)"), is an entity organized

under Cayman Island Law (Eisner (US) and Eisner (CI) are collectively referred to herein as

"Eisner" or "Defendants") and may be served through its agent: Ogier Fiduciary Services

(Cayman) Limited, 89 Nexus Way, Caruana Bay.

### VENUE

    2.    Venue is proper in East Baton Rouge Parish under La. C.C.P. art. 84. The

Defendants directed the malfeasance, misstatements, and omissions to the statewide funds and

NOFF that were located in Louisiana, both in person and via the internet, mail and special

courier services and all times knowing that the Plaintiffs would rely on their statements or

omissions.



EBR2204552

**REC'D C.P.**

**MAR - 3 2014**

East Baton Rouge Parish Clerk of Court

## DEFINITIONS

3.    The following terms are defined herein as follows:

a.    "2009 Leveraged Audit" is the audit for which Eisner was engaged by Leveraged to prepare in accordance with GAAP and GAAS in the contract executed on the Engagement Date as described in the Second Offering Memorandum.

b.    "Arbitrage" means Fletcher Income Arbitrage Fund, Ltd.

c.    "Citco" means Citco Fund Services (Cayman Islands) Limited, Citco Fund Services (Suisse) S.A., Citco Banking Corporation N.V., Citco N.V., Citco Fund Services (Europe) BV, Citco (Canada) Inc., Citco Technology Management, Inc., Citco USA, Citco Bank Nederland, N.V. Dublin Branch, Citco Global Custody, N.V., and Citco Fund Services (Bermuda) Limited, all named Defendants in the Plaintiffs' Original Petition for Damages filed in the case entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

d.    "Corsair Default" means the notice of default delivered to Leveraged in June of 2011 in which Corsair demanded redemption of the Non-Series N Shares as described in the allegations set forth in Par. 25-37.

e.    "Corsair Redemption" means the payments made to Corsair by Leveraged in exchange for the redemption of its Non-Series N Shares based upon the Corsair Default as described in the allegations set forth in Par. 25-37.

f.    "CSG" means Consulting Services Group, LLC.

g.    "Engagement Date" is the date Eisner was engaged by Leveraged to perform the 2009 Leveraged Audit, which engagement letter was executed on or about March 25, 2010 as set forth in the Second Offering Memorandum.

h.    "FAM" means Fletcher Asset Management, Inc.

i.    "FILB" means Fletcher International, Ltd.

j.    "Fletcher" means Alphonse "Buddy" Fletcher, Jr.

k.    "Fletcher Entities" means any and all entities managed by FAM, including Leveraged, Arbitrage, and FILB.

l.    "GAAS" means Generally Accepted Auditing Standards.

m.    "GAAP" means Generally Accepted Accounting Principles

2

n.    "IAP/EIC Note" means that certain promissory note described in the allegations set forth in Par. 51-67 that represented a loan to Fletcher to acquire Richcourt from Citco.

o.    "IAP/EIC Note Valuations" means the valuation of the IAP/EIC Note by Eisner reducing the value of the IAP/EIC Note to $10,000,000, which triggered the Redemption Rights because the value of the Non-Series N shareholders' capital accounts fell below 20% of the level of Series N shareholders' capital accounts as described in the allegations set forth in Par. 51-67.

p.    "Initial Audits" means the audit reports of Leveraged issued by Grant Thornton on April 22, 2008 and June 9, 2009 for the years ending December 31, 2007 and December 31, 2008, respectively.

q.    "Initial Offering" means the sale of $100 million of the Series N Shares to Plaintiffs between March 1, 2008 and April 1, 2008 on the terms described in the allegations set forth in Par. 14-19.

r.    "Leveraged" means FIA Leveraged Fund.

s.    "Misuse of Offering Proceeds" means the improper expenditure of funds by Fletcher and Leveraged after completion of the Initial Offering, and as described in the allegations set forth in Par. 38-45.

t.    "New York Meeting" means the meeting held in New York between Plaintiffs, Eisner, and Fletcher on or about July 22, 2011, where the subject of the meeting was the Waiver Solicitation as described in the allegations set forth at Par. 68-74.

u.    "Non-Series N Shares" means the Series 4, 5, and 6 shares of Leveraged owned by Fletcher, RichCourt, Corsair, any Fletcher Entity, or others that ranked junior in liquidation to the Series N Shares which could not be redeemed prior to the time that Series N Shares were redeemed and paid in full, including any accrued rate of return in accordance with the terms of the Initial Offering.

v.    "Initial Offering Documents" means the documents given by Leveraged and/or its representatives to Plaintiffs in connection with the Initial Offering, including the Offering Memorandum, the Supplement and the Articles of Association of Leverage.

w.    "Offering Memorandum" means the Leveraged Confidential Memorandum of February 21, 2007.

x.    "Related Parties Transaction" means the transactions in which Fletcher, Citco, and Fletcher Entities received cash payments or other financial benefits which were not disclosed

3

to Plaintiffs including the categories set forth in the Misuse of Offering Proceeds, Corsair Redemption, or the IAP/EIC Note.

    y.    "Restated Audits" means the new audit reports for Leveraged issued by Grant Thornton on January 20, 2011 for the years ending December 31, 2007 and December 31, 2008 because of an error in the Initial Audits.

    z.    "Redemption Right" means the right of the Series N Shareholder as set forth in the Initial Offering Documents to immediately redeem their shares upon the following events: (i) if the Series 4, 5, or 6 investors redeemed, a mandatory redemption of Series N shares was required one day before the redemption of the Series 4, 5, or 6 shares; and (ii) an automatic redemption of Series N would occur if the value of the Non-Series N shareholders' capital accounts fell below 20% of the value of Series N shareholders' capital accounts.

    aa.    "Redemption Right Offering" means the continuous offering which occurred from April 1, 2008 until November 25, 2013 during which Plaintiffs had the right to exercise the Redemption Right.

    bb.    "Second Offering Memorandum" means the FIA Leveraged Fund Supplement to the Confidential Offering Memorandum dated April 2010 disclosing the appointment of Eisner as auditor for Leveraged.

    cc.    "Supplement" means the Supplement to the Confidential Memorandum of FIA Leveraged Fund dated March 2008.

    dd.    "Waiver" means (i) the agreement executed by Plaintiffs as a direct result of the Waiver Solicitation after the New York Meeting in which Plaintiffs agreed not to exercise their Redemption Right based upon the representations made by Eisner in consideration for Eisner agreeing to issue the 2009 Leveraged Audit, and (ii) the letter agreement attached as **Exhibit A**.

    ee.    "Waiver Solicitation" means the misrepresentations and omissions made by Eisner at the time of the New York Meeting in connection with the Corsair Default, Corsair Redemption, Misuse of Offering Proceeds, and Related Parties Transaction in an attempt to obtain the Waiver from Plaintiffs.

East Baton Rouge Parish Clerk of Court

## SUMMARY OF COMPLAINT

4.      In the Initial Offering, the Plaintiffs purchased $100 million of Series N Shares in Leveraged on or about April 1, 2008. As a condition of the purchase, Plaintiffs were given the Redemption Right whereby Plaintiffs' Series N Shares would be redeemed prior to any other shareholder upon the occurrence of two events: (i) if the Series 4, 5, or 6 investors redeemed, a mandatory redemption of Series N shares was required one day before the redemption of the Series 4, 5, or 6 shares; and (ii) an automatic redemption of Series N would occur if the value of the Non-Series N shareholders' capital accounts fell below 20% of the value of Series N shareholders' capital accounts.   For this right to be meaningful, Plaintiffs must have knowledge of the facts which show the above events had occurred. During the time period that Plaintiffs could have exercised this Redemption Right, Eisner served as auditor for Leveraged.

5.      Eisner executed an engagement letter with Leveraged in March 2010 to perform the audit of Leveraged for the year ending December 31, 2009.  This audit was never completed by Eisner because it became aware that facts showing that the Redemption Right had been triggered, which would have allowed an automatic redemption by Plaintiffs and created a run on the other funds run and operated by Fletcher.  Instead of informing the Plaintiffs that the Redemption Right had triggered, issuing an audit report showing that the Redemption Right had triggered, or withdrawing from the audit engagement of Leveraged, Eisner breached its duty of independence to Leveraged and Plaintiffs as required by GAAS by doing nothing.  Eisner was more concerned about Fletcher and not causing an impact on the other related Fletcher funds that were also audited by Eisner. Eisner's "do nothing" approach prevented Plaintiffs from timely exercising their Redemption Right and eliminating or mitigating their losses.

6.      Eisner and Plaintiffs scheduled a meeting in New York to discuss the issuance of the 2009 Leveraged Audit on or about July 22, 2011. Plaintiffs were advised that no audit report would be forthcoming unless they executed a waiver of the Redemption Right held by Plaintiffs and agreed to the terms of the letter attached hereto as **Exhibit A**. At the same time of the Waiver Solicitation during the New York Meeting, and the execution of the agreement attached as **Exhibit A**, Eisner disclosed to Plaintiffs that the Redemption Right had been triggered based upon valuation concerning the IAP/EIC Note. However, Eisner failed to disclose to Plaintiffs at the time of the meeting the Corsair Default, the Corsair Redemption, and the Misuse of

East Baton Rouge Parish Clerk of Court

Offering Proceeds. After the Waiver was executed, the 2009 Leveraged Audit was never issued. In truth and in fact, Eisner desired the Waiver because of the impact the exercise of the Redemption Right would have on other Fletcher funds, including Arbitrage.

7.      Eisner's "do nothing" approach to the 2009 Leveraged Audit enabled an enormous fraud to continue, causing significant damage to Plaintiffs. On November 25, 2013 the Trustee filed the Trustee's Report and Disclosure Statement, through which the Plaintiffs became aware of the acts and omissions of Eisner and the impact of Eisner's "do nothing" approach. This "do nothing" approach to the audits enabled the fraud, and resulted in rendering the Plaintiffs' Redemption Right worthless. Thus, Eisner is solidarily liable with all other defendants by allowing the continuation of the Fletcher scheme.[1]

## ALLEGATIONS

8.      FIA Leveraged Fund was incorporated in the Cayman Islands on March 13, 1998 as a company under the Companies Law (1998 revision). Leveraged is the feeder fund in a "master/feeder" structure. The Offering Documents stated the master fund in the structure is Fletcher Income Arbitrage Fund, Ltd., a company incorporated under the laws of the Cayman Islands.

9.      On or about March 12, 2008, Denis Kiely, a representative of Leveraged, and Ronny Partain, an employee of CSG and subordinate of Joe Meals, met with Plaintiffs in Baton Rouge, Louisiana and solicited Plaintiffs to invest in Leveraged. Pursuant to a structure negotiated by various Fletcher affiliates, Citco, and the Investment Advisor Defendant, Leveraged offered a new series of shares, designated the "Series N shares," with a par value of US$0.01, at net asset value as of the date of issuance for the purchase price of $100 million. The Initial Offering was made on terms set out in Leveraged's "Supplement to the Confidential Memorandum of FIA Leveraged Fund" (the "Supplement"), together with Leveraged's Articles of Association (the "Articles") and Confidential Memorandum of February 21, 2007 (the "Offering Memorandum") (the Supplement, Articles, and Offering Memorandum are collectively referred to herein as the "Offering Documents"), all of which were prepared and

---

[1] The "other defendants" referred to herein are those named in the suit entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, including Citco Group Limited, Citco Fund Services (Cayman Islands) Limited, Citco Fund Services (Suisse) S.A., Citco Banking Corporation N.V., Citco N.V., Citco Fund Services (Europe) BV, Citco (Canada) Inc., Citco Technology Management, Inc., Citco USA, Citco Bank Nederland, N.V. Dublin Branch, Citco Global Custody, N.V., and Citco Fund Services (Bermuda) Limited, Alphonse "Buddy" Fletcher, Jr., Fletcher Asset Management, Inc., Denis Kiely, Duhallow Financial Services, LLC, Consulting Services Group, LLC, Joe Meals, Peter M. Zayfert, Lisa Alexander, and Skadden, Arps, Slate, Meagher & Flom LLP.

6

approved by Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden Arps"), a major New York law firm.

10. FRS acquired 45,000 Series N shares for a total consideration of $45,000,000.00, MERS acquired 40,000 Series N shares for a total consideration of $40,000,000.00, and NOFF acquired 15,000 Series N shares for a total consideration of $15,000,000.00,

11. Leveraged and Arbitrage were managed by Fletcher Asset Management, Inc. whose President and owner is Alphonse "Buddy" Fletcher, Jr., and by Citco. The administration of Leveraged and Arbitrage was performed by Citco, which was represented to be a world-wide administrator of hedge funds.

12. FAM is the investment manager of Leveraged, Arbitrage, and other funds within the group structure.

13. Citco Group Limited, acting through its affiliates,[2] was the Administrator of Leveraged and Arbitrage. Eisner audited the financial statements of Leveraged, Arbitrage, and other funds formed and operated by FAM during the periods in question.

**Initial Offering Of The Series N Shares To Plaintiffs**

14. The Series N Offering Memorandum contained two provisions that required a mandatory redemption of Series N Shares—even inside the two-year lock-up period. These provisions were: (i) if Series 4, 5, or 6 investors redeemed, a mandatory redemption of Series N was required one day before the redemption of the Series 4, 5, or 6 shareholder; and (ii) an automatic redemption of Series N would occur if the value of non-Series N capital accounts fell below 20% of the value of Series N shareholders' capital accounts.

15. The Offering Documents represented the terms of the investment that had been offered by FAM and Citco, which was the following:

a. Total investment in Series N shares of $100,000,000, preferred shares wherein the holders of the Series N shares would be notified and have the opportunity to redeem prior to any redemption of the Non-Series N shares, which were subordinate in payment and all other respects to the Series N shares.

b. All of the funds of Leveraged would be invested primarily in Arbitrage.

---

[2] Citco's affiliates include, but are not limited to, Citco Fund Services (Cayman Islands) Limited, Citco Fund Services (Suisse) S.A., Citco Banking Corporation N.V., Citco N.V., Citco Fund Services (Europe) BV, Citco (Canada) Inc., Citco Technology Management, Inc., Citco USA, Citco Bank Nederland, N.V. Dublin Branch, Citco Global Custody, N.V., and Citco Fund Services (Bermuda) Limited, all named Defendants in the Plaiintiffs Original Petition for Damages filed in the case entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

c.    Plaintiffs, as holders of the Series N shares, were guaranteed a return of

12% per annum and if Leveraged did not generate sufficient cash to pay that amount, the

shortfall between the guaranteed 12% per annum return and the amount actually received

would be paid from the capital accounts of the Non-Series N shareholders, i.e. Richcourt,

which had been funded via a long term loan made to this entity by JP Morgan Chase.

d.    An automatic Redemption Right would occur under the following

circumstances:  1) if Series 4, 5, or 6 investors redeemed, a mandatory redemption of

Series N was required one day before the redemption of the Series 4, 5, or 6

shareholder; and 2) if the value of Non-Series N capital accounts fell below 20% of the

value of Series N shareholders' capital accounts.

16.    The Offering Documents disclosed the terms of the investment. Specifically, the

Supplement stated the following regarding the preferred return for the Series N shares to be held

by Plaintiffs, and that the Non-Series N shares were to fund any shortfall in the guaranteed return

promised to Plaintiffs:

> The Series N Shareholders will be entitled to 100% of the Net Profit of the Fund in
> proportion to their respective Investment Accounts until they have received
> allocations equal to 12% per annum cumulative return compounded annually (the
> "Preferred Return"). The Preferred Return will be calculated monthly.
>
> In the event that in any month the Net Profit of the Fund is not sufficient to
> allocate all or any part of the Preferred Return, the Fund shall make a preferred
> allocation to the Series N Shareholders in the amount of such shortfall. The loss
> resulting from the reallocation shall be deducted pro rata from the Investment
> Accounts of the Non-Series N Shareholders.
>
> After allocation of the Preferred Return, all Non-Series N Shareholders shall share
> Net Profit in proportion to their respective Investment Accounts until they have
> received collectively, allocations equal to twelve percent (12%) per annum
> cumulative return compounded annually for the period beginning the later of April
> 1, 2008 or the date of subscription of the relevant Non-Series N Shares (the "Non-
> Series N Initial Return").
>
> After allocation of the Non-Series N Initial Return, Net Profits shall be shared
> among all shareholders in proportion to their respective Investment Accounts, until
> they have received collectively, allocations equal to eighteen percent (18%) per
> annum cumulative return compounded annually for the period beginning the later
> of April 1, 2008 or the date of subscription of the relevant Non-Series N Shares.
>
> Thereafter, all Non-Series N Shareholders shall share Net Profits in proportion to
> their respective Investment Accounts.
>
> Upon a liquidation of the Fund, Series N Shareholders will be entitled to receive
> any amounts of Preferred Return or reallocation, as the case may be and/or Net
> Profit due to them and all amounts in their respective Investment Accounts before
> any payments are made to Non-Series N Shareholders.

Supplement, pp. 11-12.

8

17.     In addition, the Offering Documents stated that the Non-Series N shares could not be redeemed prior to the redemption of the Plaintiffs' Series N shares, thus ensuring the guaranteed return, stating the following:

> Notwithstanding anything to the contrary herein contained, Series N Shares must be redeemed no later than the business day prior to the shares of Series 4, 5 and 6 of the Fund being redeemed.

Supplement, p. 10.

18.     The Offering Documents further provided for an automatic redemption in the event the value of the Non-Series N shares fell below 20% of the aggregate value of the Series N shares, stating the following:

> Notwithstanding the foregoing, a redemption of the Series N Shares will automatically occur on any Valuation Date on which the aggregate value of the Investment Accounts of Series 1, Series 3, Series 4, Series 5 and Series 6 shareholders (the "Non-Series N Shareholders") falls below 20% of the aggregate value of the Investment Accounts of the Series N Shareholders (the "Mandatory Redemption").

Supplement, p. 10.

19.     The Offering Documents stated that FAM was the investment manager of Leveraged, that Alphonse "Buddy" Fletcher controlled FAM, and that the Plaintiffs' funds were to move to Arbitrage, stating the following:

> All assets of the Fund, including monies obtained through leverage, will be invested in the Fletcher Income Arbitrage Fund, Ltd. (the "Master Fund").

> The Master Fund's investment objective is to achieve returns in the range of 10-15% per annum primarily by exploiting price inefficiencies and anomalies in both equity and fixed income securities around the world.

> The Investment Manager will attempt to achieve the Master Fund's investment objective by utilizing a number of strategies in arbitraging different valuations placed on the income streams of a variety of instruments.

> For every dollar of investor capital, The Fund will seek to borrow three dollars to invest in the Master Fund.

> The Fund's investments will be managed by Fletcher Asset Management Inc. a corporation organized under the laws of the State of Delaware, United States (the "Investment Manager"). The Investment Manager is controlled by Mr. Alphonse Fletcher Jr. Mr. Fletcher will be responsible for the management of the Fund's portfolio.

Supplement, p. 1.

**Audits Prepared After Initial Offering**

20.     Grant Thornton prepared the Initial Audits of Leveraged and Arbitrage for the years ending December 31, 2007 and December 31, 2008. Grant Thornton resigned as the auditor of Leveraged on or about March 25, 2010 without completing the 2009 Leveraged Audit.

Because of an error in the Initial Audits, Grant Thornton was required to restate the Initial Audits. The Restated Audits were issued by Grant Thornton for Leveraged and Arbitrage for the years ending December 31, 2007 and December 31, 2008 on January 20, 2011, almost one year after Grant Thornton's resignation.

21.    On or about March 25, 2010, Eisner signed an engagement letter with Leveraged to audit Leveraged.  The Second Offering Memorandum was distributed to Plaintiffs in April 2010, which contained information relating to the resignation of Citco as fund advisor and the appointment of Eisner as auditors.  Nowhere in the document does it disclose the reasons for the resignation of Grant Thornton or the appointment of Eisner as the new auditor. On February 8, 2011, Eisner issued opinions for Arbitrage's financial statements for the year-ended December 31, 2009, but Eisner never issued the 2009 Leveraged Audit.

22.    To date, Eisner has not completed the 2009 Leveraged Audit and has not informed the Plaintiffs of any financial concerns or issues that would prevent the issuance of the 2009 Leveraged Audit of which Eisner had knowledge, other than those issues discussed at the New York Meeting as further shown at Par. 51-74.

23.    Eisner knew that the Plaintiffs would rely on Eisner to perform its services in accordance with the highest professional standards applicable thereto and also knew that, because of its standing in the financial community, its decision to act as auditors of Plaintiffs added to the purported safety and quality of the Plaintiffs' investment.  Despite its knowledge of its duty to Plaintiffs, Eisner pursued a "do nothing" approach to the 2009 Leveraged Audit that enabled the continuation of the fraud and the rendering worthless of the Redemption Right held by Plaintiffs, which was not discovered by Plaintiffs until the issuance of the Trustee Report.

24.    It was Eisner's responsibility to timely express its opinions on whether the financial statements of Leveraged for the 12-month period ending December 31, 2009 fairly reflected, in all material respects, Leveraged's financial position, results of operation, changes in net assets, and cash flow in conformity with GAAP. Eisner failed to issue any timely opinions on Leveraged or adequately describe numerous significant, material events and transactions that should have been described in full, along with their likely consequences because of its conflicts of interest and loss of independence on the audits, as described herein.

**The Corsair Redemption**

25.    One of the Non-Series N shareholders of Leveraged was a Richcourt Fund controlled by Citco, known as the Corsair investment.

26.    The Corsair investment was made through an entity called Global Hawk.  The Corsair investors provided $15 million in cash, and Royal Bank of Scotland ("RBS") provided $91.3 million of leverage, for a total of $106.3 million, which was then invested into Corsair. Of that investment, approximately $34.7 million was invested into Leveraged Series 4, 5, and 6 shares.

27.    Prior to the Plaintiffs' investment in Leveraged, the Richcourt Fund had made a $3.1 million redemption request to Leveraged, which Leveraged could not satisfy because of a complete lack of liquidity.

28.    In June 2009, RBS issued a default notice and called its $91.3 million loan to Global Hawk, thus triggering a redemption request for the remaining Corsair funds in the Leverage Non-Series N Shares.

29.    The Offering Documents required that the Series N shareholders were to be redeemed at least one business day before the Corsair investors. The Corsair Redemption contravened that requirement, avoiding the mandatory redemption of the Series N shareholders that likely would have led to the collapse of the Funds.

30.    The Corsair Default resulted in an unwinding of the Corsair investment and a compulsory redemption of Corsair's investment in Leveraged Non-Series N Shares.

31.    Under the Series N Offering Documents, the Series N shares should have been redeemed one business day prior to the redemption of Leveraged Non-Series N Shares. However, the Plaintiffs' Series N shares were not redeemed, nor could they have been without liquidating the entire fund structure.

32.    Eisner failed to disclose to Plaintiffs at any time after the Engagement Date or during the Waiver Solicitation the facts and circumstances surrounding the Corsair Default or the Corsair Redemption and what impact it would have on the exercise of the Redemption Right or in depleting the net worth of Leveraged.

33.    If the 2009 Leveraged Audit had been timely issued properly disclosing the Corsair Default and the Corsair Redemption, Plaintiffs could have redeemed their shares and the loss would have been mitigated or eliminated.

11

34.    Eisner failed to opine on the impact that the Corsair Default and the Corsair Redemption would have on Leveraged, Fletcher, and the Fletcher entities.

35.    The failure to disclose the existence and consequences of the Corsair Default or the Corsair Redemption, and the misrepresentations and omissions made by Eisner at the New York Meeting during the Waiver Solicitation give rise to claims against Eisner.

36.    Plaintiffs first learned of the Corsair Default and Corsair Redemption on November 25, 2013.

37.    Had Eisner timely disclosed the Corsair Default and Corsair Redemption, timely issued the 2009 Leveraged Audit or withdrawn from the 2009 Leveraged Audit, Plaintiffs could have redeemed their shares, prevented Leveraged from making other distributions to other shareholders in Leveraged and Arbitrage, and mitigated or eliminated their loss.  Rather than timely issue the 2009 Leveraged Audit or withdraw from the audit when it became aware of the circumstances alleged herein, Eisner "did nothing" and allowed for the continuation of the Fletcher scheme even though Eisner knew or should have known there was a substantial doubt about the ability of Leveraged to continue as a going concern for a reasonable period of time.

**Misuse of Offering Proceeds**

38.    Leveraged was obligated to invest 100% of its funds into Arbitrage.  Instead, significant amounts of the investors' money, including the $100 million invested by the Plaintiffs, were invested in ways that were patently at odds with the strategy and completely adverse to Plaintiffs' interests.

39.    The investor Plaintiffs believed that their investment in Leveraged Series N shares in March 2008 would be invested in accordance with the investment strategy set out in the Initial Offering Documents and the other materials they were given.  In fact, none of the Plaintiffs' money was invested in accordance with the stated investment strategy.  Instead, the bulk of the money the Plaintiffs invested was used to fund a variety of transactions with Citco or its affiliates, and for fees paid to FAM, Fletcher, or professionals, administrators, and consultants beholden to Fletcher.  The remainder was used for redemptions and margin calls.  The Plaintiffs first learned of this information on November 25, 2013.

40.    Before the Plaintiffs invested $100 million in Series N Shares on March 31, 2008, there was $1.6 million of cash in the Fletcher System.  Accordingly, but for the Plaintiffs' investment, there would have been no cash for the various transactions.  The illiquidity of

12

East Baton Rouge Parish Clerk of Court

Leveraged and its affiliates was never disclosed to Plaintiffs. After April 1, 2008 FAM spent the money (as well as other cash inflows) as follows:

- Providing non-market terms financing to allow Richcourt Acquisition Inc. to acquire the Richcourt business ($27 million, June 20, 2008);

- Third-party redemptions ($26.6 million, April 2008 to November 2008);

- Margin calls ($24.4 million, April 2008 to October 2008);

- Citco credit facility final paydown ($13.5 million, March 31, 2008, and April 1, 2008);

- Fees to FAM ($7 million, April 2008 to November 2008);

- Fletcher Fund (FFLP) redemptions ($5.1 million, April 2008 to November 2008);

- Net investment in FIP ($4.1 million, July 2008);

- Professional, administrative, and consulting fees ($4.6 million, April 2008 to November 2008); and

- Other miscellaneous items ($1.2 million, April 2008 to November 2008).

41.    Plaintiffs became aware of the misappropriation of the Initial Offering proceeds on November 25, 2013. This was the first point in time that Plaintiffs had any notice or knowledge of when, where, and how Fletcher and the Defendants had improperly used the funds of the Initial Offering and had defrauded the Plaintiffs of their Redemption Right to mitigate or eliminate their loss.

42.    Eisner audited Arbitrage. Eisner knew that Leveraged did not invest the proceeds of the offering in Arbitrage as required by the Initial Offering Documents. Since the funds were not invested in Arbitrage, Eisner should have, at a minimum, made inquiry to see where the offering proceeds were invested and determined whether they complied with the use of proceeds restrictions set forth in the Initial Offering Documents.

43.    Eisner failed to disclose to Plaintiffs at any time after the Engagement Date the facts and circumstances surrounding the misuse of Offering Proceeds and what impact it had in depleting the net worth of Leveraged, and what impact it would have on the exercise of the Redemption Right.

44.    Eisner failed to disclose to Plaintiffs during the Waiver Solicitation at the New York Meeting the facts and circumstances surrounding the Misuse of Offering Proceeds and

what impact it had in depleting the net worth of Leveraged, and what impact it would have on the exercise of the Redemption Right, or recovery of their investment.

45.     Had Eisner timely disclosed the Misuse of the Offering Proceeds, timely issued the 2009 Leveraged Audit or withdrawn from the 2009 Leveraged Audit, Plaintiffs could have redeemed their shares, prevented Leveraged from making other distributions to other shareholders in Leveraged and Arbitrage, and mitigated or eliminated their loss. Rather than timely issue the 2009 Leveraged Audit or withdraw from the audit when it became aware of the circumstances alleged herein, Eisner "did nothing" and allowed for the continuation of the Fletcher scheme even though Eisner knew or should have known there was a substantial doubt about the ability of Leveraged to continue as a going concern for a reasonable period of time.

**Related Parties Transactions**

46.     Eisner was required to timely determine and properly classify and test all related party transactions. Eisner failed to timely opine and appropriately indentify the material related party transactions involving Fletcher, Citco, and Richcourt. These related parties transactions were never disclosed to Plaintiffs. These transactions include but are not limited to the funding of the IAP/EIC Note, the Corsair Redemption, the payment of fees to FAM, and the Misuse of the Offering Proceeds—all transactions involving companies owned by Fletcher or Citco, which were not arms-length transactions.

47.     All of the above constitute material related party transactions that should have been scrutinized carefully with a higher degree of professional skepticism, uncovered, and disclosed to investors, rather than accepted without question. Prior to November 25, 2013, Plaintiffs were not aware that Leveraged had made substantial "insider payments" to Citco and Fletcher arising from the IAP/EIC Note, the Corsair Redemption, and the Misuse of the Offering Proceeds. Eisner failed to disclose these material related party transactions, among others, when they had a duty to do so. As a result, the Plaintiffs were damaged.

48.     Eisner failed to disclose to Plaintiffs at any time after the Engagement Date the facts and circumstances surrounding the Related Parties Transactions and what impact it had in depleting the net worth of Leveraged, and what impact it would have on the exercise of the Redemption Right.

49.     Eisner failed to disclose to Plaintiffs during the New York Meeting, or in its Waiver Solicitation, the facts and circumstances surrounding the Related Parties Transactions

and what impact it would have on the exercise of the Redemption Right or recovery of their investment.

50.    Had Eisner timely disclosed the Related Parties Transactions, timely issued the 2009 Leveraged Audit or withdrawn from the 2009 Leveraged Audit, Plaintiffs could have redeemed their shares, prevented Leveraged from making other distributions to other shareholders in Leveraged and Arbitrage, and mitigated or eliminated their loss. Rather than timely issue the 2009 Leveraged Audit or withdraw from the audit when it became aware of the circumstances alleged herein, Eisner "did nothing" and allowed for the continuation of the Fletcher scheme even though Eisner knew or should have known there was a substantial doubt about the ability of Leveraged to continue as a going concern for a reasonable period of time.

**Misvaluation of the IAP/EIC Note**

51.    Prior to the Initial Offering, Citco was actively negotiating to sell to Fletcher the management company of the Richcourt Funds. This was never disclosed to Plaintiffs at the time of the Initial Offering.

52.    Within 60 days after the closing of the Initial Offering, $27 million from the Plaintiffs' funds at Leveraged was used to fund an unsecured loan on non-market terms to a company owned by Fletcher to fund Fletcher's acquisition of the Richcourt fund of funds business from Citco.

53.    In June 2008, Fletcher, through his affiliates, purchased 85% of Richcourt for $27 million.  The $27 million paid in the June 2008 closing came from the Plaintiffs' Leveraged Series N investment and was funneled through a series of Fletcher affiliates before reaching Fletcher's wholly-owned acquisition vehicle.

54.    In reality, the Richcourt acquisition was an investment by Fletcher, where he improperly used Leveraged as his own personal bank.  It was a loan to a private company, not equity, and thus was not a permitted investment strategy of Leveraged.  Everything about the investment was contrary to the Funds' advertised investment strategy.  This related party transaction was never disclosed to Plaintiffs at the time it was made or at any other time until November 25, 2013.

55.    The end result was that Leveraged received an unsecured promissory note from Income Arbitrage Partners, L.P. ("IAP") (ultimately owned by Fletcher) that was later exchanged for a promissory note from Equity Income Corporation ("EIC") (also controlled and ultimately

15

owned by Fletcher). That promissory note (originally the "IAP Note," and later the "IAP/EIC Note") was unsecured, had no covenants, and for a period of time did not have a set interest coupon. Its value was tied to the value of the Richcourt investment. The initial interest rate was 0% to 18%, depending on returns attained by IAP, derived from purported investment returns at IAP.

56.     During its audit of Leveraged, Eisner concluded that the IAP/EIC Note was grossly overvalued on Leveraged's financial statements.

57.     Although FAM had valued the IAP/EIC Note at $28.6 million, Eisner refused to certify this valuation because of Eisner's own conclusion that the IAP/EIC Note was worth only $10 million, a value that would have triggered the mandatory redemption of Leveraged's Series N Shares, and the likely collapse of the entire Fletcher structure.

58.     The value of the IAP/EIC Note was crucial to the viability of Leveraged and Arbitrage. The IAP/EIC Note was an asset of Leveraged. If the IAP/EIC Note's fair value fell below a certain level (approximately $18 million as of December 31, 2008) then, all else being equal, the compulsory redemption provisions of the Leveraged Series N shares held by the Plaintiffs would have been triggered, causing a collapse of the entire structure.

59.     Eisner failed to timely disclose to the Plaintiffs in the period between the Engagement Date and the New York Meeting that (i) the IAP/EIC Note, held by Leveraged, was only worth $10 million and making the loan violated the mandate that required 100% of Leveraged's assets be invested into Arbitrage; (ii) the loan was made to Fletcher and his related company; and (iii) the value of the IAP/EIC Note was significantly less than the face amount resulting in an event that would have allowed Plaintiffs to exercise their Redemption Right.

60.     Eisner did not timely issue the 2009 Leveraged Audit because it knew that the IAP/EIC Note should be valued at $10 million and would give the Plaintiffs the facts necessary to exercise their Redemption Right.

61.     At the $10 million value, an automatic redemption event for the Series N shares held by Plaintiffs would have been triggered as of the date of the Restated Audits if the IAP/EIC Note had been properly valued because under the terms of the Offering Documents, a writedown of the IAP/EIC Note by $17 million would have been deducted solely from the investment accounts of the Non-Series N shareholders. After such a writedown, the account value of Non-Series N investors at Leveraged would have equaled 14% of the Series N account value.

Because this deduction would have lowered those accounts so that their aggregate value was less than 20% of the aggregate value of the investment accounts of the Series N shareholders, the 20% cushion requirement would not have been met, and the Series N investors would have been entitled to immediate redemption.

62.     Eisner failed to disclose to Plaintiffs at any time after the Engagement Date the facts and circumstances surrounding the valuation of the IAP/EIC Note and what impact it would have on the exercise of the Redemption Right between the Engagement Date and the New York Meeting.

63.     In order to rectify this problem, Eisner participated with Fletcher in soliciting Plaintiffs to waive their Redemption Right at the New York Meeting held on or about July 22, 2011.

64.     Eisner failed to disclose to Plaintiffs during the New York Meeting the real motive for the Waiver Solicitation, and the fact that the real reason a Waiver was solicited was the impact the exercise of the Redemption Right would have on Arbitrage and other Fletcher entities.

65.     Despite the fact the Waiver was executed, Eisner never issued the 2009 Leveraged Audit.

66.     The failure to disclose the existence and consequences of the improper valuation of the IAP/EIC Note between the Engagement Date and the New York Meeting, and the misrepresentations and omissions made by Eisner at the New York Meeting and the Waiver Solicitation give rise to claims against Eisner.

67.     Had Eisner timely disclosed the improper valuation of the IAP/EIC Note and the fact all of these funds were loaned directly to Fletcher in a related party transaction, timely issued the 2009 Leveraged Audit or withdrawn from the 2009 Leveraged Audit, Plaintiffs could have redeemed their shares, prevented Leveraged from making other distributions to other shareholders in Leveraged and Arbitrage, and mitigated or eliminated their loss.  Rather than timely issue the 2009 Leveraged Audit or withdraw from the audit when it became aware of the circumstances alleged herein, Eisner "did nothing" and allowed for the continuation of the Fletcher scheme even though Eisner knew or should have known there was a substantial doubt about the ability of Leveraged to continue as a going concern for a reasonable period of time.

**New York Meeting**

68.     After the "do nothing" approach continued from the Engagement Date until July of 2011, Eisner, Fletcher and Plaintiffs held a meeting in New York on or about July 22, 2011. The stated purpose of this meeting was Eisner's and Fletcher's joint meeting to attempt to explain to Plaintiffs why the 2009 Leveraged Audit had not been issued and when the 2009 Leveraged Audit would be issued.

69.     The real purpose of the meeting was to induce Plaintiffs to execute a Waiver in which Plaintiffs waived their Redemption Right based upon half-truths and partial disclosures by both Eisner and Fletcher. The reason that Eisner and Fletcher stated this agreement was necessary was because the valuation of the IAP/EIC Note at $10 million triggered the Plaintiffs' Redemption Right because the value of Non-Series N capital accounts fell below 20% of the value of Series N shareholders' capital accounts.  However, Fletcher and Eisner failed to disclose to Plaintiffs the depletion of net worth that had been caused by the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and the manner such transactions impaired the going concern value of Leveraged.  In truth and in fact, it was another step in the cover-up of the Fletcher scheme that Plaintiffs did not discover until November 25, 2013.

70.     Eisner further misrepresented the value of the assets owned by Leveraged and the other Fletcher entities, in which Leveraged held a direct or indirect interest, thus further preventing the Plaintiffs from having the necessary information by which they could have exercised the Redemption Right.

71.     The New York Meeting was the first time that Eisner disclosed to Plaintiffs the issues relating to the valuation of the IAP/EIC Note.  At that meeting, the Plaintiffs were told that their failure to consent would put at risk their previously accrued 1% a month return and prevent the Leveraged audit from being issued.  It was never disclosed to Plaintiffs that the assets of Leveraged were substantially impaired, and that a loss of substantially all of their investment was likely because of the diminishment of rights and asset values created by the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions. It was never disclosed to Plaintiffs that the IAP/EIC Note had been used to make a personal loan to Fletcher, and had little or no security.

72.     Eisner and Fletcher induced Plaintiffs to execute the Waiver based upon the bogus

argument that all of the income accrual in their account would be required to be reversed and omitted to disclose to Plaintiffs at the time of the execution of the Waiver the facts and circumstances relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions. Eisner never informed Plaintiffs that the security for the Redemption Right for the initial amount of the investment had been impaired based upon the Misuse of the Offering Proceeds.

73. No disclosure was made to the Plaintiffs of the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, the gravity of the fraud that Fletcher had perpetrated to date, or the effect any of these events had on the Redemption Right of Plaintiffs, or the likelihood of the total or substantial loss of their initial investment. This failure to disclose perpetuated Fletcher's fraud.

74. Until November 25, 2013, Plaintiffs had no knowledge of the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, or the Misvaluation of the IAP/EIC Note, and Eisner failed to report any of these facts to Plaintiffs, other than the valuation issues surrounding the IAP/EIC Note as alleged in paragraph 69, which was discussed at the New York Meeting, or the fact that all of these events contributed to the depletion of capital or the effective negation of the Redemption Right.

**Conflict of Interest and Loss of Independence**

75. Professional standards governing certified public accountants such as Eisner prohibit an auditor from remaining as an auditor until employment of a successor once the auditor's independence is impaired by events including disagreement with clients, as well as the results the audit in question will have on other companies including other companies the CPA firm is auditing.

76. Eisner failed to comply with GAAS and GAAP by (i) failing to timely inform the Plaintiffs of Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, or the Misvaluation of the IAP/EIC Note, (ii) failing to timely issue the 2009 Leveraged Audit, (iii) withdrawing from the Leveraged audit engagement, or (iv) failing to timely disclose material facts at the time of the Waiver Solicitation as a condition to the issuance of the 2009 Leveraged Audit. A conflict of interest developed in Eisner's audit of Fletcher, and Fletcher's other multiple entities audited by Eisner, because Eisner became concerned that a default by Leveraged would cause a run on all of the other funds. This conflict was never

disclosed by Eisner to Plaintiffs, and impaired its ability to "independently" perform as auditor for Leveraged. Rather than withdraw from the audit because of its lack of independence, Eisner followed a "do nothing" approach that resulted in the continuation of the fraud, and what has been labeled as a Ponzi scheme. Eisner became complicit in the cover-up by pursuing the "do nothing" approach and failing to disclose the over events that depleted the capital. Eisner further failed to evaluate properly whether there was a substantial doubt about the ability of the Fletcher Entities, including Leveraged, to continue as a going concern for a reasonable period of time.

77. To date, Eisner has not issued an audit report on Leveraged and never stated why an audit report was not issued. At a minimum, Eisner had a duty to (i) inform the Plaintiffs of the numerous issues which implicated the Plaintiffs' Redemption Right and the going concern viability of Leveraged, (ii) withdraw when its lack of independence to issue the 2009 Leveraged Audit became an issue, or (iii) issue a lack of going concern audit report within a reasonable time from the Engagement Date and state the reasons for the issuance of the lack of going concern opinion. Eisner did not comply with the professional standards set forth by GAAS in timely completing its audits of the financial statements of Leveraged or withdrawing from the audit based upon the conflict of interest and lack of independence, as of and for the year ending December 31, 2009.

78. Eisner violated GAAS and the second general standard which requires that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor (GAAS, AU § 220.01).

79. It is inconsistent with the policy behind the function of an auditor not to timely bring to light disagreements or difficulties with management concerning management policies or practices that may be material to an investment decision with regard to the issuer's securities.

80. GAAS sets forth the accepted standards of practice for auditors. *United States v. Arthur Young & Co.*, 465 U.S. 805, 811, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). An accountant has an obligation to comply with GAAP and conduct the audit in accordance with GAAS.

81. GAAS requires an auditor to approach an audit with an appropriate degree of professional skepticism. Auditors are considered to have duties not just to management, but to the public at large:

> By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's

> creditors and stockholders, as well as to investing public. **This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.**

*U.S. v. Arthur Young & Co.*, 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (emphasis added). *Also see In re American Intern. Group, Inc.*, 965 A.2d 763, 831 (Del.Ch. 2009).

82.     The AICPA Code of Professional Ethics Section ET 101.08, states the following:

> "In order for the member to fulfill his obligation to render an informed, objective opinion on the client company's financial statements, the relationship between the management of the client and the member must be characterized by complete candor and full disclosure regarding all aspects of the client's business operations. **In addition, there must be an absence of bias on the part of the member so that he or she can exercise professional judgment on the financial reporting decisions made by management.**

(Emphasis added).

83.     The independent auditor assumes a *public* responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust.

84.     Independence is an auditor's ability to act with integrity and objectivity. Integrity is an individual's ability to make difficult ethical decisions or determine right or wrong by correctly applying categorical rules for behavior to particular cases by weighing the cost and benefits from the viewpoint of all persons who may be affected. Objectivity is the auditor's ability to be impartial.

85.     Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence. By participating in the New York Meeting with awareness of the exercise of the Redemption Right would have on the other Fletcher entities, Eisner became an advocate, not an auditor, and compromised its independence, violating the integrity and objectivity required of an auditor.

86.     Independent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence. Through its participation in the New York Meeting, Eisner was an advocate for Leveraged, and by doing so, it compromised its independence.

21

87.     Because of the multiple entities audited by Eisner, Eisner developed a conflict of interest in delivering a timely audit of Leveraged. The Arbitrage audit had been delivered on February 18, 2011. Eisner knew that no potential investor, including Plaintiffs, would invest, or maintain its investment, in Leveraged if its opinions on the financial statements were qualified. Eisner also knew that existing investors would demand redemption if they issued qualified opinions on the financial statements, or refused to issue an opinion, or withdrew from the engagement.

88.     Eisner knew that if the Leveraged opinion was delivered that triggered Plaintiffs' Redemption Rights, there would be a run on and collapse of the other Fletcher entities. This conflict was never disclosed to the Plaintiffs and compromised Eisner's independence as an auditor. Rather than withdraw as required by GAAS, Eisner did nothing in total and complete disregard of the Plaintiffs' Redemption Right. The interests of the Plaintiffs were sacrificed as a result.

89.     Eisner had good cause to resign based upon its reasonable determinations that Leveraged management lacked commitment to honesty in financial reporting, the reliability of Leveraged management's representations should be questioned, and it could no longer present itself to the public as independent auditors for Leveraged either in fact or in appearance. Eisner failed to timely exercise its obligation to withdraw based upon the impact it would have on Fletcher, and not based upon the obligation of candor that it had to the Plaintiffs.

90.     By participating in the New York Meeting and the Waiver Solicitation, Eisner merely considered the benefits to Fletcher's entities and did not consider the Plaintiffs' costs resulting from not exercising the Redemption Right.

91.     There is no provision of GAAS that excuses an auditor from performing its obligations where the irregularities are the result of a fraud committed by the client's management.

92.     An auditor must resign where required by professional standards when a conflict of interest exists regardless whether such resignation may jeopardize the client's interest. An auditor required to resign by professional standards need not give the client a reasonable opportunity to employ a successor auditor before resigning. Where professional standards permit or compel an auditor to resign, the resignation's effect on the client does not constitute a ground for non-application of those standards.

22

93.     Eisner failed to timely and properly evaluate in accordance with GAAP and GAAS (i) whether there was a substantial doubt about the ability of Leveraged to continue as going concerns; (ii) whether the firm was meeting its requirement of independence in attempting to obtain the Waiver; and (iii) whether the firm was meeting its requirement of independence in failing to advise Plaintiffs of all of the facts and circumstances alleged herein. The conduct of Eisner based upon GAAP and GAAS was a strong departure from accepted conduct, whether negligently or recklessly, intentional or fraudulent, and Plaintiffs have been damaged.

94.     The facts and circumstances concerning each of the above omissions directly affected the solvency of Leveraged and Arbitrage, and prevented Plaintiffs from timely exercising their Redemption Right which was the key benefit of the investment agreement with Leveraged. After the Waiver was obtained, the 2009 Leveraged Audit was never delivered by Eisner despite their representation to the contrary.

95.     What has become apparent is that the Waiver was obtained solely to protect Eisner on the previous audits issued for Arbitrage and other Fletcher entities, and to prevent Eisner from having to restate those audits or withdraw those audits because of its knowledge of the Redemption Right issues that would impacted those audits. If the Waiver had not been obtained, those audits were false and materially misleading for the reasons alleged herein. Once again, Eisner placed its own personal interests ahead of its obligation of independence to Leveraged and Plaintiffs. They contrived a rationale for Plaintiffs to execute the Waiver, when in truth and in fact, it had nothing to do with Leveraged, but Eisner's other audits.

96.     Had Eisner timely disclosed the facts and circumstances surrounding the allegations made herein, Plaintiffs could have exercised their Redemption Right, redeemed their shares, prevented Leveraged from making other distributions to other shareholders in Leveraged and Arbitrage, and mitigated or eliminated their loss.

97.     Plaintiffs relied upon and expected Eisner to monitor Leveraged, to audit Leveraged to assure that they were in compliance with material financial covenants, including the Redemption Right and the Priority Rights covenants, and to make sure the funds were used for new investments, and to assure compliance with the Redemption Right of Plaintiffs.

## COUNT 1
## LOUISIANA SECURITIES LAW
### (EISNER)

98.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97, above, as though fully set forth herein.

99.    Eisner never disclosed to Plaintiffs the conflict of interest that developed between properly completing the 2009 Leverage Audit and the impact the completion of the audit would have on the going concern of all of the Fletcher entities.

100.    The damages incurred by Plaintiffs are based upon two separate securities offerings. The first offering is the sale of the Series N Shares to Plaintiffs between January 1, 2008 and the date of the purchase of the Series N Shares on or about April 1, 2008.

101.    The second offering is the offering which occurred during the time period that the Plaintiffs could have exercised the Redemption Right, i.e. from April 1, 2008 until November 25, 2013. ("Redemption Right Offering"). The Redemption Right Offering includes any misrepresentations made in connection with the Waiver Solicitation. The Second Offering Memorandum, dated April 2010, was issued in connection with the Redemption Right Offering. If Eisner had timely conveyed certain information to Plaintiffs on the Corsair Redemption, the Misuse of the Offering Proceeds, the Related Parties Transactions, and the Misvaluation of the IAP/EIC Note, Plaintiffs could have exercised their Redemption Right in the Redemption Right Offering prior to other Non-Series N shareholders redeeming their shares.

102.    Eisner continuously failed to timely provide information to Plaintiffs from the Engagement Date to November 25, 2013 in connection with the Redemption Right Offering as alleged herein.

103.    Eisner was a substantial factor and provided substantial assistance to FAM, Citco and Fletcher and his related entities in continuing their scheme, and enabled the continuation of the material omissions concerning the operation of Leveraged in order to eliminate the Plaintiffs' Redemption Right through both the failure to timely deliver an audit or withdraw from the audit engagement. Eisner was also a substantial factor in providing misleading information as a result of material omissions in connection with Leveraged at the time of the Waiver Solicitation at the New York Meeting, whether intentionally or negligently.

104.    To date, Eisner has not given the shareholders, including Plaintiffs, an explanation for why the 2009 Leverage Audit was not issued, other than as set forth in the New York

Meeting, and Plaintiffs have not learned the true reasons until the issuance of the the Trustee Report on November 25, 2013. If the 2009 Leveraged Audit had been timely issued, Plaintiffs could have redeemed their shares and eliminated or mitigated their losses.

105.     The reasons Eisner was so late in explaining the reasons it never issued the 2009 Leveraged Audit and completion of work is inexplicable, and implies, at best, it was complicit in the cover-up of the misrepresentations and omissions by Fletcher, Eisner, and Citco from January 1, 2009 until the current date. Eisner failed to disclose certain material information in order to extricate itself from any liability that it had arising from the prior audits of Arbitrage and to prevent the entire house of cards from falling down while it was associated with Fletcher.[3]

106.     Because of the failure of Eisner to disclose this financial information in the 2009 Leveraged Audit, Plaintiffs continued to exercise investment decisions to "hold" the Series N shares and not exercise their right to redeem the shares as allowed by the corporate charter.

107.     Eisner is liable to Plaintiffs under the Louisiana Securities Law, La. R.S. 51:701, *et seq.*, as a result of the failure to register provision under Section 712(A)(1) for its delay in the delivery of the 2009 Leveraged Audit, and its failure to disclose material financial information to Plaintiffs in connection with the Redemption Right Offering and Waiver Solicitation as to why it had not completed the 2009 Leveraged Audit. In addition to liability under Section 712(A)(1) of the Louisiana Securities Law, liability exists under Section 712(A)(2) of the Louisiana Securities Law as a result of material omissions made in connection with the Series N shares.

108.     Eisner's material omissions caused Plaintiffs to retain ownership of the Series N shares including the execution of the Waiver. Eisner failed to disclose to Plaintiffs the facts set forth in Par. 20 to 97 relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note. Eisner's complicity in failing to disclose the facts relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note, failing to deliver timely audits that addressed the facts alleged in Par. 20 to 97, or withdraw from the engagement induced Plaintiffs to hold their position in Leveraged. Eisner's actions and omissions were done knowing the material effect the disclosure (or lack thereof) would have on the Plaintiffs exercising their Redemption Right.

---

[3] It is currently unknown what relationship Eisner has with Citco. This will be the subject of discovery that will possibly lead to further explanation for the conduct of Eisner.

109.    Eisner intentionally or recklessly made these omissions during the Redemption Right Offering and in connection with the Waiver Solicitation knowing that if the information alleged in Par. 20 to 97 relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note was disclosed, Plaintiffs would exercise their Redemption Right.

110.    Eisner failed to disclose to Plaintiffs the conflict of interest that it had based upon Eisner's relationship with the other Fletcher entities, in failing to timely render the 2009 Leveraged Audit or withdraw from the audit engagement of Leveraged.

111.    As a direct and proximate result of these omissions in connection with the Redemption Right Offering and in connection with the Waiver Solicitation, Plaintiffs have suffered damages, namely the loss of their investments in Leveraged.  As such, Eisner is liable for Plaintiffs' damages resulting therefrom.

112.    Each and every day after the Engagement Date, Eisner is liable as a "Seller," in the Redemption Rights Offering and as a "person occupying a similar position or performing similar functions" as an officer, manager, directors, or controlling person of the issuer under Section 714(B) Louisiana Securities Law.

**Primary Liability for Failure to Comply with Registration Provisions**

113.    La. R.S. 51:712(A) provides that:

A. It shall be unlawful for any person:

(1) To offer to sell or to sell any security in violation of R.S. 51:703, 705, or any rule, regulation or order promulgated or issued by the commissioner under this Part.

114.    La. R.S. 51:705 provides that:

**A. Generally.** It shall be unlawful for any person to offer for sale or sell any securities in this state unless any of the following conditions are met:

(1) They are subject to an effective registration statement under this Part.

**B. Registration by qualification.**
                        ******
(2) The registration statement shall contain the information specified in R.S. 51:705(C)(1) and shall be accompanied by the documents specified in R.S. 51:705(C)(2) except that the commissioner may by rules or regulations provide that any such ...........Any such registration statement shall contain such other information and be accompanied by such other documents as the commissioner may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors.

115.  The information provided by Leveraged during the Redemption Right Offering and the Waiver Solicitation after the date that a timely audit should have been issued by Eisner was not accurate.

116.  The Redemption Right Offering and Waiver Solicitation in connection with the Redemption Right Offering did not disclose the information relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note.

117.  The knowing omission of this information that would have been required in the timely issued 2009 Leveraged Audit is a violation of these statutes, and as such, Eisner is liable to Plaintiffs for its failure to comply with La. R.S. 51:705 and La. R.S. 51:712 (A)(1).

**Primary Liability As A Seller For Material Misrepresentations And Omissions**

118.  La. R.S. 51:712 (A)(2) provides that:

A. It shall be unlawful for any person:
*** 
(2) To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

119.  The facts and circumstances surrounding the depletion of the capital of Leveraged was not learned by Plaintiffs until November 25, 2013, other than the half truth regarding the Misvaluation of the IAP/EIC Note at the New York Meeting.

120.  Eisner is liable as a "seller" under the Louisiana Securities Law for the omissions based upon its relationship with Arbitrage, Leveraged, and Fletcher. Eisner provided "substantial assistance" and was a "substantial factor" in convincing Plaintiffs to "hold" the sales of stock by not issuing the 2009 Leveraged Audit.

121.  The failure to timely deliver the 2009 Leveraged Audit, or make the disclosures as alleged herein, is a violation of these statutes and as such, Eisner is liable to Plaintiffs for its failure to comply with La. R.S. 51:705 and La. R.S. 51:712(A)(1).

122.  The failure to timely disclose the conflict of interest Eisner had in finalizing the 2009 Leveraged Audit because of Eisner's association with the Redemption Right Offering is a violation of these statutes and as such, Eisner is liable to Plaintiffs for its failure to comply with La. R.S. 51:705 and La. R.S. 51:712(A)(1).

**Secondary Liability For Violations Of Section 712**

123.    La. R.S. 51:714(b) provides the following:

Every person who directly or **indirectly** controls a person liable under Subsection
A of this Section, every general partner, executive officer, **or** director of such
person liable under Subsection A of this Section, **every person occupying a
similar status or performing similar functions,** and every dealer or salesman
**who participates in any material way in the sale** is liable jointly and severally
with and to the same extent as the person liable under Subsection A of this
Section unless the person whose liability arises under this Subsection sustains the
burden of proof that he did not know and **in the exercise of reasonable care**
could not have known of the existence of the facts by reason of which liability is
alleged to exist.

(Emphasis added).

124.    Because Eisner is a person *occupying a similar status or performing similar*

*functions* as the officers, directors, partners and managers of Leveraged, liability exists for

Eisner resulting from Leveraged's failure to register the security as well as the material

misrepresentations and omissions set forth herein. Eisner had the power to influence and control

Leveaged, issue financial statement that described the Corsair Default, Corsair Redemption,

Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the

IAP/EIC Note, and did influence and control, directly or indirectly, the decision making of

Leveraged, including the timeliness of the content and dissemination of the financial statements

once it knew that a "going concern" opinion would be required to be issued unless the Waiver of

Plaintiffs was obtained. In truth and in fact, the timing of the issuance and circumstances

surrounding the issuance of the 2009 Leveraged Audit, given Eisner's knowledge of the Corsair

Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions,

and Misvaluation of the IAP/EIC Note, was the primary factor dictating whether the operation of

Leveraged would continue, and by having this power, Eisner had the ability to dictate how the

company would be operated and what disclosures would be made. Eisner had the final "say so"

on whether Leveraged continued as a going concern based upon the decisions that were jointly

made herein after the Engagement Date with management of Leveraged.  Eisner literally had the

power to "pull the plug" on the company by withdrawing from the audit and stating the basis for

the withdrawal.

125.    Eisner is liable to Plaintiffs for violations of Section 712(A)(1) and 712(A)(2)

under Section 714(B) because it occupied "*a similar status or performing similar function*" as

the seller of the securities. Eisner has secondary liability under Section 714(B) for violations of

712(A)(1) and 712(A)(2) just as if it was the original seller.

### Liability Based Upon "In Connection With Sale Of Any Security" - La. R.S. 51:712(D)

126.    Plaintiffs have direct claims against Eisner based on La. R.S. 51:712(D), which states the following:

D.    It shall be unlawful for any person *in connection with the offer, sale, or purchase* of any security, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud.

(2) To engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser or seller.

La. R.S. 51:712(D) (emphasis added).

127.    Section 712(D) provides that Eisner will be liable to Plaintiffs if Eisner has made an omission "in connection with the sale or purchase of a security." In addition, Section 712(D) allows for recovery if there is an "omission" in connection with the sale of a security by "any person."

128.    The Plaintiffs were a holder of a security until they elected to redeem such security. The "in connection with" standard allows for a broader time period for Plaintiffs to file a claim between the date of purchase and the continuation of the cover up of the alleged omissions in connection with the Redemption Right Offering and Waiver Solicitation. Plaintiffs continued to "hold" the shares and elected not to redeem the Series N shares because of the omissions relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note as alleged at Paragraphs 20 to 97.

129.    As a direct and proximate result of Eisner failing to timely deliver the 2009 Leveraged Audit, withdraw from the audit engagement, explain why the audits were not timely issued, or disclose the conflict of interest Eisner had in serving as auditors for other Fletcher Funds which prevented the issuance of the 2009 Leveraged Audit, Plaintiffs refrained from exercising their Redemption Right, and continued to "hold" the investment based upon false and misleading information.

130.    Plaintiffs are entitled to damages in the amount of the purchase price of the Series N shares as a result of violations of Section 712(D) of the Louisiana Securities law based upon (i.) omissions made in connection with the Redemption Right Offering, (ii) the Waiver Solicitation, and (iii.) for the failure to provide accurate information relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions,

29

and Misvaluation of the IAP/EIC Note in the entire time period in which the Plaintiffs have held the investment after the Engagement Date.

**Damages Resulting From Securities Law Violations**

131.    Eisner has violated the Louisiana Securities Law as set forth herein.  Eisner has liability under the Louisiana Securities Law based upon being a "Seller" under Section 712 of the Act and a person *occupying a similar status or performing similar functions* under Section 714(B). This liability arises from being a participant in the sale of unregistered securities by Leveraged and based upon the non-disclosure of information that was material to Plaintiffs in the Redemption Right Offering.

132.    In accordance with Section 714(A) of the Louisiana Securities Law, every company who participates in any material way in the sale is liable jointly and severally liable with and to the same extent as the person liable under Section 712(A) unless the person whose liability arises under Section 712(A) sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist.

133.    Eisner is solidarily liable for all damages incurred by Plaintiffs with Fletcher, FAM, Citco, Grant Thornton, and the other defendants in the actions entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, and *Firefighters' Retirement System, et al. v. Consulting Services Group, et al.*, Docket No. 627,710, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

134.    Eisner, along with FAM, participated in the Redemption Right Offering in a material way based upon the allegations set forth herein and are jointly and severally liable for Plaintiffs' damages resulting therefrom with all other Defendants as alleged in the legal actions entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, and *Firefighters' Retirement System, et al. v. Consulting Services Group, et al.*, Docket No. 627,710, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

135.    As a result of the foregoing violations of the Louisiana Securities Law, Plaintiffs have sustained actual damages and are entitled to actual damages in an amount to be shown at the trial of this matter.

East Baton Rouge Parish Clerk of Court

## COUNT 2
## HOLDER CLAIMS
### (EISNER)

136.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97 above, as though fully set forth herein.

137.    Material omissions in the Redemption Right Offering caused Plaintiffs to retain ownership of the Series N shares after Eisner failed to properly disclose the information alleged relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note as alleged in Paragraphs 20 to 97. The actions and inactions of Eisner induced Plaintiffs to hold their position in Leveraged.

138.    Eisner failed to disclose material information relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note, knowing that Plaintiffs would consider this information in exercising its Redemption Right. If the 2009 Leveraged Audit had been timely issued properly disclosing the information alleged in herein or had Eisner withdrawn from the engagement, Plaintiffs could have redeemed their shares and the loss would have been mitigated or eliminated.

139.    When Eisner failed to disclose the material information set forth herein in connection with the Redemption Right Offering, Eisner knew facts or had access to information suggesting that its public statements of Leveraged, FAM, and Fletcher were not accurate.

140.    Eisner recklessly, and without regard for the truth, made the omissions relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note set forth in Paragraphs 20 to 97 in connection with the Redemption Right Offering knowing that Plaintiffs would rely upon this information in exercising its Redemption Rights.

141.    Plaintiffs justifiably relied upon the Second Offering Memorandum naming Eisner as auditor and would have redeemed their shares had they known the facts alleged at Par. 20 to 97 in connection with the Redemption Right Offering.

142.    As a direct and proximate result of their reliance upon the omissions of Eisner, Plaintiffs have suffered damages, namely the loss of their investments in Leveraged. As such, Eisner is liable for Plaintiffs' damages resulting therefrom.

143. Eisner is solidarily liable for all damages incurred by Plaintiffs with Fletcher, FAM, Citco, Grant Thornton, and the other defendants in the actions entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, and *Firefighters' Retirement System, et al. v. Consulting Services Group, et al.*, Docket No. 627,710, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

## COUNT 3
## FRAUD CLAIMS
## (EISNER)

144. Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97 above, as though fully set forth herein.

145. Material omissions in the Redemption Right Offering caused Plaintiffs to retain ownership of the Series N shares after Eisner failed to properly disclose the information alleged in Paragraphs 20 to 97. The actions and inactions of Eisner induced Plaintiffs to hold their position in Leveraged. Eisner failed to disclose this information knowing that Plaintiffs would rely upon this information in exercising its Redemption Right. If the true facts as alleged herein had been disclosed, the 2009 Leveraged Audit had been timely issued properly disclosing the information relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note alleged in Paragraphs 20 to 97, or had Eisner withdrawn from the engagement, Plaintiffs could have redeemed their shares and the loss would have been mitigated or eliminated.

146. Eisner failed to disclose material information in connection with the Waiver Solicitation as alleged herein.

147. When Eisner made its false statements and committed its omissions in connection with the Redemption Right Offering or the Waiver Solicitation, Eisner knew facts or had access to information suggesting that its statements of Leveraged were not accurate and they omitted to tell Plaintiffs facts that would have been material in their decision-making process, all because of the conflict of interest, as alleged herein.

148. Eisner recklessly, and without regard for the truth, failed to disclose the information set forth in Paragraphs 20 to 97 relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note in connection with the Redemption Right Offering and Waiver Solicitation

knowing that Plaintiffs would rely upon the representations, hold the Series N shares, and not
redeem such shares.

149.    Plaintiffs justifiably relied upon the Second Offering Memorandum naming
Eisner as auditor and the representations made at the New York Meeting, and would have
redeemed their shares had they known the facts alleged at Par. 20 to 97 in connection with the
Redemption Right Offering and Waiver Solicitation.

150.    As a direct and proximate result of the omissions of Eisner, Plaintiffs have
suffered damages, namely the loss of their investments in Leveraged.  As such, Eisner is liable
for Plaintiffs' damages resulting therefrom.

151.    Eisner is solidarily liable for all damages incurred by Plaintiffs with Fletcher,
FAM, Citco, Grant Thornton, and the other defendants in the action entitled *Firefighters'
Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial
District Court, Parish of East Baton Rouge, State of Louisiana, and *Firefighters' Retirement
System, et al. v. Consulting Services Group, et al.*, Docket No. 627,710, 19th Judicial District
Court, Parish of East Baton Rouge, State of Louisiana.

## COUNT 4
## NEGLIGENCE
## (EISNER)

152.    Plaintiffs incorporate by reference each and every allegation contained in
paragraphs 1 through 97 above, as though fully set forth herein.

153.    Material omissions in the Redemption Right Offering and the Waiver Solicitation
caused Plaintiffs to retain ownership of the Series N shares after Eisner failed to properly
disclose the information alleged in Paragraphs 20 to 97 relating to the Corsair Default, Corsair
Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation
of the IAP/EIC Note.  The actions and inactions of Eisner induced Plaintiffs to hold their
position in Leveraged.  Eisner failed to disclose the information relating to Corsair Default,
Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and
Misvaluation of the IAP/EIC Note knowing that Plaintiffs would exercise their Redemption
Right if the information was disclosed.

154.    If the 2009 Leveraged Audit had been timely issued properly disclosing the
information alleged in Paragraphs 20 to 97, or had Eisner withdrawn from the engagement,
Plaintiffs could have redeemed their shares and the loss would have been mitigated or

eliminated.

155.  When Eisner failed to disclose the material information alleged herein in connection with the Redemption Right Offering or Waiver Soliciation, Eisner knew facts, should have known facts, or had access to information suggesting that its public statements of Leveraged, FAM, and Fletcher were not accurate.

156.  When Eisner failed to disclose the information relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note in connection with the Waiver Solicitation from Plaintiffs, Eisner knew facts, or should have known facts, suggesting that the information conveyed to Plaintiffs was not accurate, and it omitted to tell Plaintiffs facts that would have been material in their decision-making process, all because of the conflict of interest, as alleged herein.

157.  Eisner negligently failed to disclose the information set forth in Paragraphs 20 to 97 relating to the Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note in connection with Redemption Right Offering and the Waiver Solicitation.

158.  After Eisner was engaged as the auditor for Leveraged, it was obligated to:

A.  Timely issue an unqualified audit, issue a qualified or lack of going concern audit, or withdraw from the engagement of the audits of Leveraged.  Between January 1, 2009 and July 2011, it sat on its hands and did nothing because of its concern for the value of the IAP/EIC Note and other assets of Leveraged.  In doing nothing and not acting timely, Eisner breached the duties it owed to Plaintiffs;

B.  Disclose any conflict of interest that it had in serving as auditor of Leveraged;

C.  Not serve as auditor of Leveraged if any event arising in the engagement with Leveraged or other clients resulted in a lack of independence;

D.  Be candid with Plaintiffs at all times, including the New York Meeting, of all circumstances surrounding Leveraged once it assumed the duty of participating in the meeting to obtain the Waiver.

159.  Eisner had a duty to Plaintiffs because Eisner knew that Plaintiffs were relying upon the work performed by Eisner and the completeness and accuracy of the representations made to Plaintiffs at the New York Meeting at the time Eisner solicited Plaintiffs to execute the

Waiver.

160.    Plaintiffs justifiably relied upon the Second Offering Memorandum naming Eisner as auditor, and the representations made by Eisner at the New York Meeting, and would have redeemed their shares had they known the facts relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note alleged at Par. 20 to 97 in connection with the Redemption Right Offering and the Waiver Solicitation.

161.    Plaintiffs would have redeemed their shares had they known the facts alleged at Par. 20 to 97 in connection with the Redemption Right Offering and Waiver Solicitation. As a direct and proximate result of the omissions of Eisner, Plaintiffs would have redeemed their shares had they known the facts alleged at Par. 20 to 97 in connection with the Redemption Right Offering and Waiver Solicitation, the failure of Eisner to timely disclose the Conflict of Interest, and the failure of Eisner to disclose the information alleged at Par 20 to 97 during the Redemption Right Offering and the New York Meeting in which Eisner solicited the Waiver, Plaintiffs have suffered damages, namely the loss of their investments in Leveraged.  As such, Eisner is liable for Plaintiffs' damages resulting therefrom.

162.    Eisner failed to exercise that degree of care, skill, and diligence that is exercised by prudent practicing certified public accountants in connection with the 2009 Leveraged Audit, the Redemption Right Offering and the Waiver Solicitation.

163.    As a result of each of these breaches of the duty owed by Eisner to the Plaintiffs, the Plaintiffs have been injured in the amount of their investment in the Series N shares and other damages alleged herein.

**COUNT 5**
**THIRD PARTY BENEFICARY CLAIMS**
**(EISNER)**

164.    Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97, above, as though fully set forth herein.

165.    Eisner entered into a binding and valid contract on March 25, 2010 with Leveraged to timely provide an audit of the financial statements of Leveraged for the benefit of Plaintiffs.  The Plaintiffs were third party beneficiaries of the contract between Eisner and Leveraged.

166.    These services were uniquely provided to, and for the benefit of, Plaintiffs as the

East Baton Rouge Parish Clerk of Court

holder of the Series N shares, which are a substantial part of the capital of Leveraged.

167.    The Plaintiffs understood that Eisner would be providing these services for their benefit. Further, the Plaintiffs would not have continued to hold their investment and refrained from exercising their Redemption Right had Eisner provided Plaintiffs accurate information after their engagement concerning Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note.

168.    Eisner knew that Plaintiffs had a Redemption Right. Eisner understood that Plaintiffs would be relying on Eisner to perform their contractual obligations for the benefit of Plaintiffs and Eisner knew that the information that it was withholding on the valuation of the assets of Leveraged was material to Plaintiffs' decision in electing to redeem shares or in allowing Plaintiffs to exercise certain rights that would prevent Leveraged from redeeming shares that ranked junior to the Series N shares.

169.    Eisner knew that the information it was withholding was material to Plaintiffs' ability to form and exercise decisions with respect to maintaining their investment in Leveraged.

170.    The Plaintiffs had a right, under the circumstances of the contract, to expect Eisner's timely performance for Plaintiffs' benefit, and Eisner understood that the Plaintiffs were the immediate object of the performance of Eisner's contractual obligations such that Eisner has a duty to compensate Plaintiffs for its failure to perform its obligations to Plaintiffs as set forth above more fully.

171.    Eisner, as auditor for Leveraged, owed the Plaintiffs a duty to exercise reasonable care in the performance of its duties as auditor because Plaintiffs were a third party beneficiary to the contract. Eisner had the duty to timely issue an unconditional audit, a lack of going concern audit, or notify Leveraged and the Plaintiffs it was withdrawing as auditors.

172.    Article 1978 of the Louisiana Civil Code provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary." This is known as a *stipulation pour autrui* in Louisiana.

173.    The agreement of Eisner to serve as the auditor provided a benefit to Plaintiffs as the third party and was a condition to the investment of Plaintiffs.

174.    The audit contract executed by Eisner provided a direct benefit to Plaintiffs and formed the condition or consideration of such contract.

175.    Eisner knew that Plaintiffs would rely on its reporting in analyzing the investment

as well as the basis for determining the equity of Leveraged, and the analysis of whether Plaintiffs should exercise their Redemption Right. Further, Eisner knew that the information had to be provided on a timely basis in order for the Redemption Right in excess of $100,000,000 to have any true value.

176.   The breaches by Eisner of its duty of care owed to Plaintiffs directly and/or proximately caused damages to Plaintiffs.

177.   Eisner breached its duties to the Plaintiffs, as a third party beneficiary of the contracts described herein, at the time of the Redemption Rights Offering to Plaintiffs and at all times between the Engagement Date to the date of this Petition, by failing to perform the requisite professional services in accordance with the standard of reasonable care required of fund auditors for the reasons alleged herein and by failing to timely provide these services.

178.   Because of Eisner's breach of its contractual duties owed to Plaintiffs as a third party beneficiary of such contract, the Plaintiffs are entitled to an award of compensatory damages against Eisner in an amount to be determined at trial.

**COUNT 6**
**NEGLIGENT MISREPRESENTION**

179.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97 above, as though fully set forth herein.

180.   Eisner incorporates by reference each and every allegation made in the Count entitled Negligence alleged herein a Par. 20 to 97.

181.   Eisner negligently misrepresented or negligently failed to inform Plaintiffs of material financial information as alleged herein. Eisner had a legal duty to Plaintiffs to disclose material information relating to Corsair Default, Corsair Redemption, Misuse of the Offering Proceeds, the Related Parties Transactions, and Misvaluation of the IAP/EIC Note, and Eisner knew that Plaintiffs would rely on the information provided to Plaintiff in exercising their Redemption Right.

182.   By failing to disclose this information to Plaintiffs, Eisner breached its duty to Plaintiffs.

183.   The negligent misrepresentations have resulted in damages to Plaintiffs, as alleged herein, and Eisner is liable to Plaintiffs for all of Plaintiffs' damages resulting therefrom.

## COUNT 7
## UNFAIR TRADE PRACTICES (La. Rev. Stat. § 51:1401, *et seq.*)
## (EISNER)

184.   Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 through 97 above, as though fully set forth herein.

185.   This allegation is pleaded in the alternative to provide a basis for recovery in the event that it is determined that any particular defendant for any particular course of conduct alleged herein does not have liability under the Louisiana Securities Law. These allegations include but are not limited to (i) Eisner's failure to disclose the Conflict of Interest; (ii) Eisner's failure to disclose the facts alleged herein in connection with the Waiver Solicitation; (iii) Eisner's failure to correct the value of the IAP/EIC Note in the restated audit or to timely advise Plaintiffs of the transfer of funds that benefited Citco who was the former manager of Leveraged; (iv) Eisner's failure to deliver a timely audit or advise Plaintiffs of the reason that a timely audit was not issued based upon the disagreement it was having with Leveraged as to the value of the IAP/EIC Note; (v) the actions of Eisner in failing to issue an audit or withdraw from the audit during the term of the Redemption Right Offering in an attempt to extricate itself from any liability in connection with its prior audits of related Fletcher Companies; (vi) failure to advise Plaintiffs of the fact relating to  the  Corsair Default and the Corsair Redemption, Misuse of Offering Proceeds, and Related Parties Transactions; (vii) failure to advise Plaintiffs of the facts alleged in Par. 20 to 97; and (viii) misrepresentations to Plaintiffs as to the reason that it needed the Waiver was relating to the 2009 Leveraged Audit was in truth and in fact, the reason Eisner required the Waiver related to the favorable impact that it had on other Fletcher audits that had been previously issued by Eisner so that these audits would not have to be withdrawn or restated.

186.   Based upon the above allegations, Eisner has violated the Louisiana Unfair Trade Practices Act, La. Rev. Stat. § 51:1401, *et seq.* (the "Act"), and the actions of Eisner constitute deceptive trade practices within the meaning of the Act.  Accordingly, Plaintiffs are entitled to damages under the Act and are entitled to reasonable attorney fees, as provided for therein.

187.   The unfair trade practices alleged in this Petition were knowingly and intentionally committed by Eisner with total and complete disregard for the Redemption Right of Plaintiffs.

188.   Eisner is solidarily liable for all damages incurred by Plaintiffs with Fletcher, FAM, Citco, Grant Thornton, and the other defendants in the actions entitled *Firefighters' Retirement System, et al. v. Citco Group Limited, et al.*, Docket No. 619,601, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana, *Firefighters' Retirement System, et al. v. Consulting Services Group, et al.*, Docket No. 627,710, 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana.

## DAMAGES OWING BY DEFENDANTS

189.   Plaintiffs have suffered substantial financial injury as a direct, foreseeable and proximate result of Eisner's breach of its duties, as alleged herein. Plaintiffs are hereby entitled to the return of the purchase price of the Series N shares or, in the alternative, an amount equal to the difference between the purchase price of the Series N shares and any amount realized from such shares to date, which is nothing. In addition, the Plaintiffs have suffered substantial financial injury as a direct, foreseeable, and proximate result of the breaches of Eisner's statutory, tort, and contractual duties, as alleged herein. In addition to the general damages flowing directly from these breaches, the Plaintiffs are entitled to recover consequential, incidental and special damages, lost profits, including but not limited to the original investment plus 12% guaranteed return on their investment, lost opportunities, and other economic damages and attorney fees.

## JURY DEMAND

190.   Plaintiffs demand trial by jury of all issues so triable.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, pray for the following:

A.   that Defendants be cited to appear and answer;

B.   that, upon trial on the merits, Plaintiffs recover general, consequential, incidental, special and actual damages;

C.   that, upon trial on the merits, Plaintiffs recover attorneys' fees, prejudgment interest, post judgment interest, costs of court, and such other and further relief to which Plaintiffs may be justly entitled; and

D.   for all other equitable and legal relief as provided by law.

Respectfully submitted:

**PREIS GORDON, APLC**

Phillip W. Preis, Bar Roll No. 10706
Charles M. Gordon, Jr., Bar Roll No. 23758
Crystal D. Burkhalter, Bar Roll No. 27396
Caroline P. Graham, Bar Roll No. 31295
Charles M. Thompson, Bar Roll No. 32728
Jennifer R. Dietz, Bar Roll No. 33804
John N. Grinton, Bar Roll No. 34571
2150 Bank One Centre - North Tower
450 Laurel Street (70801-1817)
Post Office Box 2786 (70821-2786)
Baton Rouge, Louisiana
Telephone: (225) 387-0707
Facsimile: (225) 344-0510
**ATTORNEYS FOR PLAINTIFFS,
FIREFIGHTERS' RETIREMENT SYSTEM,
MUNICIPAL EMPLOYEES' RETIREMENT
SYSTEM OF LOUISIANA and NEW
ORLEANS FIREFIGHTERS' PENSION &
RELIEF FUND**

PLEASE HOLD SERVICE AT THIS TIME



40

East Baton Rouge Parish Clerk of Court



EISNERAMPER
ACCOUNTANTS & ADVISORS

EisnerAmper LLP
750 Third Avenue
New York, NY 10017-2703
T 212.949.8700
F 212.891.4100

www.eisneramper.com

July 22, 2011

Firefighters' Retirement System
Municipal Employees Retirement System of Louisiana
New Orleans Fire Fighters' Pension and Relief Fund

Gentlemen:

In connection with the ~~investigation~~ review being conducted by Firefighters' Retirement System, Municipal Employees Retirement System of Louisiana, New Orleans Fire Fighters' Pension and Relief Fund (collectively, the "Louisiana Funds") of the FIA Leveraged Fund its Investments in other entities managed by Fletcher Asset Management, Inc. collectively (the "Fletcher Fund"), we have received the Fund's authorization to allow representatives of the Louisiana Funds to speak with EisnerAmper LLP (which for purposes of this letter includes EisnerAmper(Cayman) Ltd.) partner Peter Testaverde concerning audit services provided by EisnerAmper LLP's to the Fletcher Fund.

EisnerAmper LLP is prepared to discuss the audit services provided by EisnerAmper LLP to the Fletcher Fund on the following terms and conditions:

- By engaging in the communications contemplated by this letter, EisnerAmper LLP assumes no responsibility to or relationship with the Louisiana Funds with respect to the audit services provided to the Fletcher Fund;
- In consideration of EisnerAmper LLP discussing its audit work with the Louisiana Funds, the Louisiana Funds agree that they do not acquire any rights as a result of such communication that they would not otherwise have had and acknowledge that EisnerAmper LLP does not assume any duties or obligations to the Louisiana Funds (including but not limited to any duty to update the Louisiana Funds as to developments or matters arising after completion of the communication contemplated by this letter);
- The Louisiana Funds agree that the communications contemplated by this letter are confidential and shall not be discussed with any party other than EisnerAmper LLP, the Fund, and/or the Louisiana Funds (and their attorneys or representatives) and shall not be used in any way to assert a claim against EisnerAmper LLP arising out of the audit services provided by EisnerAmper LLP to the Fletcher Fund.

Please confirm your agreement by executing this letter below and returning it to me by fax (917-286-8625) or email (peter.testaverde@eisneramper.com). Fax and/or emailed signatures shall be deemed original for purposes of this letter.

Very truly yours,

EISNERAMPER LLP

Peter W. Testaverde, Jr.
Partner

New York  |  New Jersey  |  Pennsylvania  |  Cayman Islands
*EisnerAmper is an independent member of PKF International Limited*

EBR2204553



EXHIBIT

A

ALL-STATE LEGAL®

East Baton Rouge Parish Clerk of Court



ACCOUNTANTS & ADVISORS
Accepted:

Firefighters' Retirement System (FRS)

By: _____

Title: FRS GENERAL COUNSEL

Date: 07/22/11

Municipal Employees Retirement System of Louisiana (MERS)

By: _____

Title: MERS GENERAL COUNSEL

Date: 07/22/11

New Orleans Fire Fighters' Pension and Relief Fund (NOFF)

By: _____

Title: NOFF GENERAL COUNSEL

Date: 07/22/11

**FIREFIGHTERS' RETIREMENT SYSTEM**
**MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM OF LOUISIANA**
**NEW ORLEANS FIRE FIGHTERS' PENSION AND RELIEF FUND**

The undersigned, Steven S. Stockstill, Executive Director and General Counsel for Firefighters' Retirement System of Louisiana, has been formally retained as counsel by Firefighters' Retirement System of Louisiana, Municipal Employees' Retirement System of Louisiana and New Orleans Fire Fighters' Pension and Relief Fund and has been duly authorized and has full authority to execute and deliver this letter agreement on behalf of the Pension Plans.

The undersigned hereby waives any requirement that any portion of the Series N Shares of FIA Leveraged Fund be mandatorily redeemed on any Valuation Date occurring on or before June 30, 2011, on which the aggregate value of the Investment Accounts of Series 1, Series 3, Series 4, Series 5 and Series 6 shareholders falls below 20% of the aggregate value of the Investment Accounts of the Series N shareholders, as more fully described in the Supplement to the Confidential Memorandum of the Fund Relating to Series N Shares of FIA Leveraged Fund (the "Memorandum"). Notwithstanding the waiver set forth in this letter agreement, any mandatory redemption occurring on or after July 1, 2011, and thereafter, shall be governed solely by the provisions of the Memorandum. Capitalized terms used herein without definition shall have the meanings set forth in the Memorandum.

Date: 07/28/11

Steven S. Stockstill, Executive Director/General Counsel
Firefighters' Retirement System

Date: 7/29/11

Richard Hampton, Executive Director
New Orleans Fire Fighters' Pension and Relief Fund

Date: 07/28/11

Bob Rust, Executive Director
Municipal Employees' Retirement System of Louisiana

I, Denis J. Kiely, am duly authorized to accept and do hereby agree to the foregoing letter agreement and waiver:

Name: Denis J. Kiely, Director
        FIA Leveraged Fund
Date: 9/2/11

| | | |
|---|---|---|
| FIREFIGHTERS' RETIREMENT SYSTEM, MUNICIPAL EMPLOYEES' RETIREMENT SYSTEM, AND NEW ORLEANS FIREFIGHTERS' PENSION & RELIEF FUND | * * * * * * * | DOCKET NO. _____ SEC. _____ |
| | | 19TH JUDICIAL DISTRICT COURT |
| VERSUS | * * | |
| | * | PARISH OF EAST BATON ROUGE |
| EISNERAMPER, LLP, AND EISNERAMPER (CAYMAN ISLANDS) LTD. | * * * | STATE OF LOUISIANA |

**************************************************************************

### REQUEST FOR NOTICE OF TRIAL DATE

**TO THE CLERK OF COURT** in and for the above Parish:

**PLEASE TAKE NOTICE** that undersigned counsel, attorney for parties listed, does hereby request written notice of the date of trial of the above matter, as well as notice of hearings (whether on merits or otherwise), orders, judgments and interlocutory decrees, and any and all formal steps taken by the parties herein, the Judge or any member of Court, as provided in the *Louisiana Code of Civil Procedure*, particularly *articles 1571,1572, 1913* and *1914* thereof.

**I HEREBY CERTIFY** that a copy of the above and foregoing *Request for Notice of Trial Date* has this day been served on all parties appearing in proper person, and on all parties appearing through representation by attorneys, by depositing a copy of same in the United States Mail, properly addressed and postage prepaid to any individuals appearing on their own behalf at their address, and to those parties represented by mailing a copy to their counsel.

Baton Rouge, Louisiana this 28th day of February, 2014.

Respectfully submitted:

PREIS GORDON, APLC

_____
Phillip W. Preis, Bar Roll No. 10706
Charles M. Gordon, Jr., Bar Roll No. 23758
Crystal D. Burkhalter, Bar Roll No. 27396
Caroline P. Graham, Bar Roll No. 31295
Charles M. Thompson, Bar Roll No. 32728
Jennifer R. Dietz, Bar Roll No. 33804
John N. Grinton, Bar Roll No. 34571
2150 Bank One Centre - North Tower
450 Laurel Street (70801-1817)
Post Office Box 2786 (70821-2786)
Baton Rouge, Louisiana
Telephone: (225) 387-0707
Facsimile: (225) 344-0510



EBR2204554

FILED
EAST BATON ROUGE PARISH, LA
2014 FEB 28 PH 4:56
DEPUTY CLERK OF COURT

1

# CITATION
## (Long Arm LSA R.S. 13:3201 et seq.)

FIREFIGHTERS RETIREMENT SYSTEM, ET AL
(Plaintiff)

vs.

EISNERAMPER LLP, ET AL
(Defendant)

NUMBER:  C628653 SECTION 23

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

** VIA LOUISIANA LONG ARM STATUTE LSA R.S. 13:3201 ET SEQ **

TO:  EISNERAMPER LLP
     ATTN: CHARLES WEINSTEIN

GREETINGS:

YOU HAVE BEEN SUED.

Attached to this citation is a certified copy of the petition*. The petition tells you what you are being sued for.

You must EITHER do what the petition asks in accordance with LSA R.S. 13:3201 et seq. OR, you must file an answer or other legal pleading in the office of the Clerk of Court at 300 North Boulevard, Baton Rouge, Louisiana.

If you do not do what the petition asks, or if you do not file an answer or legal pleading, a judgment may be entered against you without further notice.

This citation was issued by the Clerk of Court for East Baton Rouge Parish, on **03-MAR-2014**.



Sharon Zito

_Deputy Clerk of Court for_
**Doug Welborn, Clerk of Court**

Requesting Attorney: CHARLES M GORDON

*Also attached are the following documents:
**PETITION FOR DAMAGES;**

CITATION-LONG ARM- 2412


EBR2149527